SO ORDERED: November 20, 2024.



_____
James M. Carr
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) |
| WATCHMEN SECURITY LLC, | ) Case No. 24-00087-JMC-11 |
| | ) |
| Debtor. | ) |
| | ) |

### ORDER REGARDING DISALLOWANCE OF ASSERTED SECURED CLAIM

THIS MATTER comes before the Court on the *Limited Objection to Claim 21 of Reliance Financial with Notice and Certificate of Service* filed by Watchmen Security LLC ("Debtor") on August 7, 2024 (Docket No. 123) (the "Objection"). The Court reviewed the Objection, Proof of Claim No. 21-1 (the "Claim") filed by Reliance Financial ("Creditor") on March 19, 2024, and the *Response to Limited Objection to Claim 21 of Reliance Financial* filed by Creditor on August 20, 2024 (Docket No. 128) (the "Response"), and heard the representations of counsel for Debtor and counsel for Creditor at a hearing on August 21, 2024 (the "Hearing"). At the Hearing, the Court disallowed the Claim as a secured claim and allowed the Claim as a general unsecured claim. This opinion sets forth more fully the bases of the

Court's ruling at the Hearing.

The Parties' Positions

By its proof of claim, Creditor alleges that it holds a claim in the amount of $55,669.65 secured by "Accounts/Purchased Receipts". As the basis of the Claim, Creditor asserts: "Agreement for the sale of future receipts". Attached to the proof of claim are a *Standard Merchant Cash Advance Agreement* dated February 16, 2023, including various addenda and related documents (collectively, the "Agreement"), and a *UCC Financing Statement*, File #202302233035626 filed with the Indiana Secretary of State on February 23, 2023 (the "UCC-1").[1]

Debtor objects to the asserted secured status of the Claim. Debtor pledged virtually all of its assets, owned as of the petition date, January 9, 2024 (the "Petition Date"), as security to the first position lienholder, The Freedom Bank of Virginia ("Freedom Bank"). As of the Petition Date, there was no value in any of Debtor's pre-petition assets (or their products and proceeds) to which Creditor's security interest, if any, could attach.[2] Accordingly, Debtor asks that the Claim be allowed only as a general unsecured claim.

Creditor's Response has two components: (1) Debtor failed to rebut the *prima facie* validity of the Claim (Response, ¶ 4); and (2) the collateral is being improperly valued – rather than valuing the collateral on the Petition Date, the Court should engage in a forward-looking valuation where the value of Debtor's post-petition receipts and anticipated receipts during the

---

[1] Creditor asserts that it was not required to file a UCC financing statement because Creditor, not Debtor, owns the "future receipts" that it purchased from Debtor pre-petition in a transaction that was a sale of the "accounts" and "proceeds of accounts". As a result, Creditor argues that its interest in the accounts was automatically perfected pursuant to UCC §§ 1-201(37), 9-109(a)(3) and 9-309.

[2] The Court notes that Freedom Bank filed Proof of Claim No. 12-1 on February 21, 2024 asserting a claim in the amount of $1,173,680.12, which is secured to the extent of the value of the collateral described in Freedom Bank's *UCC Financing Statement*, File # 202212303015295, filed on December 30, 2022. That collateral includes, among other things, a first priority lien on all of Debtor's accounts receivable and proceeds.

proposed plan period are included in determining the value of Creditor's collateral (Response, ¶¶ 5-9).

At the Hearing, counsel for Creditor argued that (1) Creditor holds an interest in property, asserted to be property of Debtor's estate, in accounts receivable generated by Debtor post-petition; and (2) Creditor "owns" those accounts receivable generated by Debtor post-petition based on the pre-petition Agreement. Creditor further argued that 11 U.S.C. § 552(a) does not limit Creditor's interest in Debtor's property to an interest in pre-petition accounts receivable.

The Agreement

Under the Agreement, Creditor advanced to Debtor $125,000 (the "Advance").[3] In exchange for the Advance, Debtor purported to "sell" to Creditor $186,250[4] of unspecified "Receivables". In addition:

- Section 1 of the Agreement provides that " ... until the [$186,250] has been received in full by [Creditor], [Debtor's] Receivables, up to the balance of [$186,250], are the property of [Creditor] and not the property of [Debtor]".

- Section 3 of the Agreement purports to "Cap" the amount that Creditor will collect from Debtor on a weekly basis. However, the "Cap" of $6,651.79 also may be a floor because if Creditor does not collect the weekly Cap, Creditor may collect in excess of 9% of Debtor's Receivables.

---

[3]  The Agreement characterizes the Advance as the "Purchase Price" of the sold receivables. The Agreement also provides for certain fees to be paid to Creditor reducing, to $121,250, the amount of the Advance actually disbursed to Debtor.

[4]  In the Agreement, the parties projected that the specified dollar amount of receivables purchased would represent an unidentified 9% of Debtor's receivables generated during the pay back period.

- Section 15 of the Agreement says that the parties agree "that the [Advance] under this Agreement is in exchange for the [$186,250 of Debtor's receivables] and that such [Advance] is not intended to be, nor shall it be construed as a loan from [Creditor] to [Debtor]".

- Section 31 of the Agreement provides "To secure [Debtor's] performance obligations to [Creditor] under this Agreement and any future agreement with [Creditor], [Debtor] grants to [Creditor] a security interest in collateral (the "Collateral"), that is defined as collectively: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, and instruments, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by [Debtor]; and (b) all proceeds, as that term is defined by Article 9 of the UCC."[5]

- Section 36 of the Agreement chooses New York state law to govern the Agreement (to the extent not superseded by the Bankruptcy Code).

Austin L. Smith, Debtor's principal, executed a *Standard Merchant Cash Advance Agreement Guarantee* (the "Guarantee"), personally and absolutely guaranteeing Debtor's performance of the Agreement. In section G11 of the Guarantee, Mr. Smith agreed that if Debtor breached the Agreement and both Debtor and Mr. Smith, as guarantor, became obligated to Creditor, then Creditor would be entitled to recover prejudgment interest at the rate of 24% per annum and such interest would continue to accrue post-petition. Under sections G10 and G12 of the Guarantee, Creditor would also recover its attorney fees and costs.

---

[5] Default would result in the percentage of Debtor's receivables that would secure repayment increasing from 9% to 100% of Debtor's receivables.

The Bankruptcy Case

This chapter 11 case was commenced on January 9, 2024. On January 18 and 31 and February 14 and 29, 2024, the Court conducted a series of hearings on requests by Debtor to use cash collateral on an interim and final basis. By interim orders dated January 23, 2024, January 31, 2024 and February 15, 2024 and a final order dated March 1, 2024 (Docket Nos. 26, 30, 44 and 69, respectively), the Court found that, at the Petition Date, Debtor held approximately $17,567.87 in cash and approximately $2,000 in "collectible receivables".[6] As a result of such hearings, the Court determined that the pre-petition cash and receivables were fully encumbered by a first perfected security interest held by Freedom Bank to secure a debt in excess of $1.17 million.

Reasoning

*The Asserted Nature of Creditor's Interest*

In its Response to the Objection, Creditor asserts the following:

6. The Debtor sold future receipts, as that term is defined in the Agreement between the Debtor and Reliance Financial that is attached to the claim, to Reliance Financial. The transaction was a sale of "accounts" and "proceeds of accounts" as those terms [are] defined by the Uniform Commercial Code. As the transaction between the Debtor and Reliance Financial was a sale of accounts and proceeds of accounts, Reliance Financial automatically obtained a security interest in the future receipts that were sold to it by the Debtor (no specific grant of a security interest was necessary) and the security interest was perfected on attachment. See UCC §§ 1-201(37), 9-109(a)(3), and 9-309. Nevertheless, Reliance Financial filed a UCC-1 Financing Statement, which is attached to its claim, to put others on notice of its transaction.

7. As the security interest in the Receipts purchased did not arise via a security agreement, but rather, automatically, its security interest is not subject to Section 552 of the Bankruptcy Code and thus, its security interest attached to each and every Receipt generated post-petition without the need for a replacement lien.

---

[6] In the interim order dated January 23, 2024 (Docket No. 26), the approximate amount of cash on hand was $9,329.87. The delta between that amount and the $17,567.87 amount in subsequent cash use orders is the $8,238 balance of the pre-petition retainer held by Debtor's counsel.

8. Considering the nature of the transaction, which is contemplated by the plain language of Section 506 of the Bankruptcy Code, the only appropriate way to value the collateral if the Court does not outright deny the objections due to the Debtor's failure to rebut the prima facie validity of the claims as it should, is a forward-looking valuation where the Debtor's post-petition receipts and anticipated receipts during the proposed Plan period (which is reflected in the cash flow projections) is examined because, again, Reliance Financial has an interest in all post-petition receipts and that is what was contemplated when the transaction was entered into.

9. When the monthly operating reports and cash flow projections are examined, it is clear the claim is fully secured because the Debtor, even during the pendency of this case, has collected enough receipts (which is shown by the gross revenue numbers in such documents) to satisfy the obligation, and there is simply no reason why Reliance Financial should not realize the benefit of its bargain with the Debtor (i.e.- having all receipts they purchased from the Debtor remitted as long as the Debtor is continuing to operate and collect receipts).

Creditor's assertions give rise to three lines of inquiry: (a) what is Creditor's interest in Debtor's pre-petition receivables; (b) what is Creditor's interest in Debtor's post-petition receivables; and (c) what gives rise to Creditor's interest – a loan or a true sale.

(a) *Creditor's Interest in Debtor's Pre-Petition Accounts Receivable*

Whatever interest (ownership or lien) Creditor held in Debtor's pre-petition receivables under the Agreement, it was determined by the Court to be inferior to the security interest held by Freedom Bank. Bankruptcy Code § 506(a) provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest … is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, … and is an unsecured claim to the extent that the value of such creditor's interest … is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

Given the relatively small value of Petition Date receivables and arguable proceeds and the overwhelming amount of prior secured debt owed to Freedom Bank, there is no value in the pre-petition receivables to create any allowable secured claim for Creditor.

(b)     *Creditor's Interest in Debtor's Post-Petition Accounts Receivable*

Notwithstanding its lack of Petition Date collateral, Creditor asserts a secured claim, contending that it acquired, pre-petition, Debtor's post-petition accounts receivable. However, Creditor fails to explain (and would be hard pressed to do so) (1) how it could acquire, by a purported pre-petition purchase, accounts receivable of Debtor generated post-petition; and (2) how any such acquisition could be effected free and clear of the lien of Freedom Bank.

It cannot be posited that a pre-petition debtor somehow has the authority and power to sell or otherwise transfer any interest in accounts receivable which do not come into existence until post-petition and are, therefore, property of the bankruptcy estate. In a very insightful article, *A "Sale" of Future Receivables: Disguising a Secured Loan as a Purchase of Hope*, the authors negate Creditor's central position, explaining that

> To begin with, the type of transaction at issue in the *Cornerstone* cases[7] – a putative present sale of rights to payment that do not yet exist (or, more accurately, of an undivided share of such nonexistent rights) – is both a metaphysical and legal impossibility. It is metaphysically impossible because the essence of a sale is the transfer to the buyer of that which is being purchased. A transfer of future rights to payment – that is, rights that as yet do not exist – cannot occur unless and until the rights to payment arise.
>
> It is a legal impossibility for much the same reason. The law simply does not comprehend or countenance a present transfer of future property. It might recognize and even enforce a *promise* to transfer property that the promisor hopes later to acquire, but that is something different. As one court put it, "[a]t law one cannot transfer by a present sale what he does not then own, although he expects to acquire it. But, while [such a] contract [is] without effect at law as a contract of sale, it operate[s] as an executory agreement to sell." Indeed, it is a basic legal maxim that "one cannot give what one does not have" (or, in one of several phrasings in Latin, "*nemo dat qui non habet*").

---

7       *Off. Comm. of Unsecured Creditors v. LG Funding, LLC (In re Cornerstone Tower Servs., Inc.),* No. BK16-40787, 2018 WL 6199131 (Bankr. D. Neb. Nov. 9, 2018); *Off. Comm. of Unsecured Creditors v. EBF Partners, LLC (In re Cornerstone Tower Servs., Inc.)*, No. BK16-40787, 2019 WL 127359 (Bankr. D. Neb. Jan. 3, 2019).

Thus, "[t]here is no doubt that the assignment of a truly future claim or interest does not work a present transfer of property. It does not because it cannot; no property yet exists." It is simply incoherent to assert that a putative buyer has purchased rights to payment that do not exist at the time of the transaction and that may never exist. The buyer's property interest arises, if at all, when the seller first obtains an interest in the applicable right to payment.

The provisions of the Uniform Commercial Code are consistent with these concepts. Specifically, Article 9 does not allow a party to create a security interest in property that does not yet exist. Under U.C.C. § 9-203(b)(2), a debtor must have "rights in the collateral or the power to transfer rights in the collateral" in order for a security interest (including the security interest of a purchaser of receivables) to attach. As the Official Comments to that section explain, "[a] debtor's limited rights in collateral, short of full ownership, are sufficient for a security interest to attach. However, in accordance with basic personal property conveyancing principles, the baseline rule is that a security interest attaches only to whatever rights a debtor may have, broad or limited as those rights may be."[8]

Because the Agreement could not effect a pre-petition sale or transfer of post-petition receivables (that did not exist pre-petition), the next question becomes "Did Debtor, post-petition, transfer any interest in post-petition receivables to Creditor or did a security interest granted to Creditor under the Agreement attach to any of the post-petition receivables"? The short answer to both questions is "no", Debtor did not and could not effect a post-petition transfer of any interest in post-petition receivables by sale or grant of a security interest.[9] Moreover, Debtor's post-petition receivables are not "proceeds" of pre-petition collateral. In relevant, part, § 102(64) of Article 9 of the U.C.C. defines "proceeds" as:

> (A) Whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral.
> (B) Whatever is collected on, or distributed on account of, collateral.
> (C) Rights arising out of collateral.

---

[8] John F. Hilson & Stephen L. Sepinuck, A "Sale" of Future Receivables: Disguising A Secured Loan as a Purchase of Hope, 9 Transactional Lawyer 14, 15 (2019) (footnotes omitted).

[9] In addition to the discussion above, see the discussion below regarding unauthorized post-petition transfers of estate property.

Debtor historically operates as a security company "providing security, surveillance and consulting" – it is a service not a sale business.[10] Any of Debtor's post-petition receivables arose from services performed by Debtor post-petition and, therefore, could not have been identifiable proceeds of pre-petition collateral.

    (c)    <u>Loan or True Sale</u>

The interest in Debtor's receivables claimed by Creditor is either (1) a security interest; or (2) outright and complete ownership. Several cases have addressed whether an interest granted to a party (like Creditor) under a merchant cash advance agreemen (an "MCA") constitutes (1) a security interest to secure repayment of a loan; or (2) an absolute transfer or true sale of a debtor's receivables.

*Cap Call, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797 (Bankr. D. Mont. 2021) held that advances under an MCA, much like the Agreement, constituted a loan purportedly secured by receivables, <u>not</u> a true sale of those receivables as the MCA in that case expressly provided. *Shoot the Moon* explained:

> An entity seeking liquidity may monetize its present or future accounts receivable in two primary ways: by either selling or borrowing against the receivables. While the monetization methods differ in obvious and key respects, they are not entirely dissimilar. The shared aspects are reflected in the commentary to Article 9 of the Uniform Commercial Code where the drafters recognize that "[i]n many commercial financing transactions the distinction is blurred." In light of this, Article 9 treats both secured loans and "a sale of accounts, chattel paper, payment intangibles, or promissory notes" as secured transactions subject to that statute's detailed rules regarding perfection and priority. The statute stops short of "delineat[ing] how a particular transaction is to be classified" and, by design, the "issue is left to the courts."
>
> Courts have formulated a holistic, multipart framework to examine a transaction on the way to classifying it as a sale or a loan. In a notable article, Robert D. Aicher and William J. Fellerhoff catalog factors courts often consider:
>     (1) whether the buyer has a right of recourse against the seller;

---

[10]     *See* § 2.2 of the *Amended Small Business Chapter 11 Plan for Watchmen Security LLC dated June 28, 2024* filed by Debtor on June 28, 2024 (Docket No. 106).

>> (2) whether the seller continues to service the accounts and commingles receipts with its operating funds;
> (3) whether there was an independent investigation by the buyer of the account debtor;
> (4) whether the seller has a right to excess collections;
> (5) whether the seller retains an option to repurchase accounts;
> (6) whether the buyer can unilaterally alter the pricing terms;
> (7) whether the seller has the absolute power to alter or compromise the terms of the underlying asset; and
> (8) the language of the agreement and the conduct of the parties.
>
> As with many multi-factor tests, no individual factor or combination thereof is determinative. The inquiry is not a quantitative exercise susceptible to replication by a computer program, but a comprehensive and heavily contextual endeavor. A court's "[a]nalysis of the various factors and their impact on the nature of the parties' agreement is fact-intensive, and a determination must be made based on the totality of the circumstances." That said, a consideration that overlays and unites the factors is how the parties allocated *risk*. A sale typically occurs when the risk of loss from the purchased assets passes to the buyer – a gamble usually reflected in the purchase price. Conversely, in a disguised loan, the parties may employ various methods to allocate risk – the putative seller typically remains exposed to the underlying receivables and may grant the putative buyer recourse to sources of recovery beyond the receivables.

*Shoot the Moon*, 635 B.R. at 812-14 (footnotes omitted).[11] *Shoot the Moon* decided that its holding would be the same whether that court applied New York law (as the MCA's choice-of-law provision provided) or Montana law (the home of the debtors).

In the present case, the Agreement reflects at least seven of the eight factors indicating that the transaction underlying the Claim is in fact a loan secured by a junior lien against Debtor's pre-petition accounts receivable, <u>not</u> a "true sale" of such receivables. As to the ultimate question of "how the parties allocated risk", it is clear that the Debtor and its principal, as guarantor, bore the entire risk of non-payment of the "sold" (undifferentiated 9%) receivables with Creditor bearing no risk that it would be limited to recovery from the "sold" receivables.

---

[11] For an excellent overview of the history of MCAs and issues raised by MCAs, *see* Kara J. Bruce, *The Murky Process of Characterizing Merchant Cash Advance Agreements*, Bankruptcy Law Letter, Vol. 42, Issue 4, April 2022, at 1.

If the Court characterizes the Agreement as a security agreement under which Debtor granted only a security interest in some or all of its receivables, then any claim that such a security interest would attach to Debtor's post-petition receivables would be defeated by 11 U.S.C. § 552(a). Pursuant to 11 U.S.C. § 552(a), "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."[12] Accordingly, by operation of law as expressly dictated by the Bankruptcy Code, the Agreement cannot be the basis of a security interest in favor of Creditor in any accounts receivable acquired by the estate after the Petition Date.

The subject of *Smoker v. Hill & Assocs.*, 204 B.R. 966 (N.D. Ind. 1997), was a settlement agreement under which "Hill" collaterally assigned to "Smoker",[13] to secure repayment of a debt, (1) commission agreements between Hill, an insurance broker, and various insurance companies; and (2) future commissions generated and payable to Hill under such agreements. After Hill filed a chapter 13 bankruptcy case, Hill attempted to cut off Smoker's security interest in commissions Hill earned post-petition. On appeal from the bankruptcy court, the District Court, Judge Allen Sharp, held that § 552(a) would have cut off Smoker's security interest in post-petition receivables unless such receivables constituted identifiable proceeds of Smoker's pre-petition collateral. Judge Sharp explained:

> Under Indiana law, an agreement which *conditionally* transfers ownership rights to a creditor and permits the creditor to exercise its right to possession only upon a default is a security agreement—not an outright assignment. *Brown,* 476 N.E.2d at 892; *see* IND.CODE § 26–1–1–201(37) (1993) (A security interest created by such an agreement is "an interest in personal property or fixtures which secures payment or performance of an obligation"). …

---

[12] Exceptions are provided thereto in 11 U.S.C. § 552(b), but none of those exceptions is applicable.

[13] The assignments were expressly characterized as absolute and not collateral assignments.

> Section 552(a) of the Bankruptcy Code states the general rule that a prepetition security interest does not extend to property acquired by the estate after the filing of the bankruptcy petition. The exception to this general rule, found in § 552(b), applies to proceeds, product, offspring, or profits of encumbered property acquired postpetition if (1) the parties entered into a security agreement before the bankruptcy petition was filed; *and* (2) the security interest extends to prepetition property of the debtor and to proceeds, product, offspring, or profits of such property. Thus, while creditors ordinarily may not reach property of the debtor acquired postpetition, § 552(b) provides an exception if the creditor can demonstrate a connection between prepetition and postpetition property.

*Smoker*, 204 B.R. at 973.

In the present case there is no possibility that the receivables generated by Debtor post-petition were proceeds of any of Creditor's pre-petition receivables or other collateral.[14]

If we concede that the Agreement effects, as it purports, a "true sale" of Debtor's receivables and does not constitute merely the purported grant of security interests therein, then any purported transfer of post-petition receivables that was not approved by the Court using the law and procedure provided by 11 U.S.C. § 363, is an unauthorized post-petition transfer of estate property and avoidable pursuant to 11 U.S.C. § 549. Were there to be any such unauthorized transfer, then Creditor's claim would be fully disallowable pursuant to 11 U.S.C. § 502(d).

Finally, the Court acknowledges the displeasure of counsel for Creditor at the Hearing that the Court was addressing issues outside "the four corners" of the Objection. However, Creditor placed the nature of the transaction before the Court in the Response. Specifically, Creditor asserts that the nature of the transaction mandates a different valuation than Debtor asserts in the Objection. Because Creditor asked the Court to consider the nature of the transaction when ruling on the Objection, Creditor's argument that the Court is "out of bounds"

---

[14] *See* page 8 herein regarding the definition of proceeds.

is unavailing.  Moreover, 11 U.S.C. § 105(a) expressly authorizes the Court to *sua sponte* make any determination necessary or appropriate.  That section provides that "[n]o provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders".

For the reasons described on the record at the Hearing and in this opinion, the Court, effective as of the conclusion of the Hearing, SUSTAINS the Objection and DISALLOWS the Claim as a secured claim and ALLOWS the Claim as a general unsecured claim.[15]

IT IS SO ORDERED.

# # #

---

[15] The Court has not been asked to address any objection that could be asserted regarding Creditor's unsecured claim.  The Court has not chosen to address, *sua sponte*, any such possible objections.